IMPARTIAL FORMAL HEARING PURSUANT TO
EDUCATIONAL LAW SECTION 4404(1) AND
COMMISSIONER OF EDUCATION REGULATION
SECTION 200.5 BEFORE PAUL T. BUMBALO, ESQ.,
IMPARTIAL HEARING OFFICER

_____

In the matter of a Due Process complaint
by J.S.

                              Petitioner                **DECISION**

-against-                                                **& ORDER**


State of New York: New York State
Department of Xxxxxxxxxx and
Xxxxxxxxxxxxx Xxxxxxxxxx

                              Respondent

_____


### SECTION I:  PROCEDURAL POSTURE

This IHO was contacted by the Superintendent at the ECF on or about September 22, 2016

regarding a Due Process Hearing Request that had been filed on or about August 11, 2016.  This Impartial

Hearing Officer contacted the Superintendent for the ECF requesting contact information for attorneys

and advocates regarding the matter.  A prehearing conference took place on October 4, 2016, hearing

dates were agreed upon for 11/3/2016, 11/17/2016, 11/17/2016 and 11/18/2016 however the location of

the hearing was yet to be determined.  It should be noted that the case had been filed on or about

8/12/2016 and that the resolution period had ended on 9/11/2016 which created a compliance date of

10/26/2016.  Both parties indicated that there was a mutual request for a 30 day extension which extended

the compliance date to 11/25/2016.

The hearing had been held at the WCF on 11/17/2016 and 11/18/2016.

In order to allow for the provision of transcripts and post hearing briefs there was a mutual request for a

1

30 day extension, extending the compliance deadline to 12/25/2016. There was another request for an

extension based upon a delay in the delivery of transcripts. It was anticipated that the transcripts would

be available and that post hearing briefs would be timely submitted, however there was a follow up

request for an extension which was granted to allow for the submission of post hearing briefs. Pursuant to

a scheduling order the post hearing briefs were due on or about noon on 1/17/2017, this IHO indicated

due to the complexity of some of the legal issues there may be a need for supplemental post hearing

briefs. A subsequent extension was granted for the purpose of allowing time to review the post hearing

submission and rendering a decision resulting in a compliance date of 02/16/2016. Upon a review of the

post hearing submissions this IHO requested that the parties submit supplemental /briefs. They agreed to

submit by 02/08/2017 and this IHO's decision would be due on 2/22/2017 and an extension was

implemented to accommodate this schedule.

The following witnesses testified on behalf of the RESPONDENT: OP, the Director of Special

education services; EM, Captain of Discipline; SM, Gen Ed Teacher at ECF; JS, Psychologist and; DW,

Special Education Teacher at ECF. In addition, the PETITIONER JS testified on his own behalf.

The following exhibits were admitted acknowledging that the PETITIONER'S Exhibits

were previously marked Exhibits; A, B, B1, C, D, E, F, G, H, I, J, K, L, M, N,O, P, Q, R, S, T, U, V, W,

X, Y, Z and AA, BB, CC, DD, EE.  THE RESPONDENT Exhibits included 1, 2 and 3.  IHO Exhibits

were Exhibit 1 the Exhibit Index, Exhibit 2 Extensions.


## SECTION II: SUMMARY OF WITNESS

The first witness was OP she is the Coordinator of Special education services with the

Department Of Corrections Community Services. She has 17 years experience with

RESPONDENT and experience as a SET in BOCES and Public Schools. Her current duties

include ensuring inmates get services and she oversees psychologists pursuant to Directive 4805

which is the Special Education Directive effective 08/21/2015 T32. RESPONDENT did not

have any signed documents that JS had a disability.  She claims that providing JS with educational services has been difficult due to his disciplinary problems,  resulting is his being moved because of disciplinary problems and his behavior was not appropriate for educational settings.  They were never able to obtain an IEP T33 and as a result RESPONDENT was not able to determine what the most appropriate educational setting was.  They provided all types of services with civilian teachers and IP aides which are assistants from the correctional setting.  All students are tested to identify their levels as APE, pre-GED, and HSE according to their reading and math levels.  If the inmate is in general population with a signed IEP they rely upon Code 40 to determine if there were prior special educational services.   Code 40 looks at BETA scores which is psychological group test and then the student inmate is referred to a special educational faculty after RESPONDENT has signed consents for evaluations T35.  RESPONDENT has 15 facilities which provide special education services and there are 9 psychologists that service those facilities.  The normal protocol after they determine an inmate has a special education needs is to obtain consents, obtain records from prior schools districts, they do testing and evaluation and have meetings.  The person that signs the consent may participate via phone call or electronic records; once they receive the records they verify services that the implemented program is consistent with Article 40 T37.  During keeplock or SHU they ensure testing is administered in a confined area, RESPONDENT provides the same curriculum, provides services through the teachers after diagnostic testing with ABE they diagnosis needs, services and weaknesses T38.  They follow the normal school calendar 5 days a week with breaks every 2 days T39 as contained on RESPONDENT Exhibit 1.  With JS they asked for records, RESPONDENT did not implement an educational program due to his movement from place to place because of disciplinary problems T40.  She reviewed Exhibit Z summary of academic

3

profile T41 showing all of the different placements that he has been receiving educational programs and dates that he was actually participating in programs.   With cell study a teacher goes to the cell providing him with materials plus the student inmate can request library services with books of interest, extra help, counseling, trips to the library.  Security is a concern of harm to JS or others.  JS did inappropriate things, fighting and throwing things T44.  They rendered appropriate educational services to JS Math, Reading, Social Studies and, Science.

They have a 60 day window to implement IEPs but if a student inmate is moved that hinders the implementation since the next psychologist must follow up.  They follow the Directive 4805 and write for records after they get consents T47.  They asked for records from the prior schools but did not get any.  They did not convene the CSE to develop an IEP T48.  She reviewed Exhibit M which was a request for educational records dated 01/05/2015 which was sent to PS 149 New York, NY by Psychologist JS after the PETITIONER had entered DOCS in December 2013. They did not know he had a disability when he was coming in.  They reviewed Exhibit D question 6 which was a CNYPC Mental Health Evaluation filled out by a RESPONDENT dated 12/27/2013 with a copy sent to DOCS Guidance Counselor indicating he had previously received Special education services which is considered pre-referral.  The referral is done at the DOCS facility T57-T58.  The document was carbon copied to the guidance unit.  It is unclear whether the guidance unit sent it to OP's department.  Normally the psychologist would do a classroom observation and academic testing; it was difficult to consider an FBA because the student was not in a classroom setting often because he was in SHU or cell studies. Even though JS exhibited behaviors that would interfere with his school and education it was the

belief of the witness that most of the behaviors did not take place in the school setting but other settings.  They were provided procedural safeguards.   Exhibit J was a request for educational records dated 12/01/2014. According to Exhibit Z the student was receiving cell study from 01/24/14 to 03/21/14 and started receiving special education services on 03/28/14 until 05/30/2014 and cell studies from 10/03/2014 until 12/05/2014, the special education services 01/23/2015 until 02/27/2015, cell study from 04/10/2015 until 04/140/15 to 01/15/16, then cell study from 01/22/2016 to 03/25/2016 the cell study from 08/19/2016 to 09/30/2016 then special education services from 10/14/2016 until his release from custody. The witness reviewed Exhibit K an evaluation of Mr. A and found out there was no learning disability in December 2014. There was however a CSE recently after recent testing but there is no recommendation for services rendered T78.  The student was found not to be LD, it was unable to be determined if he qualified as ED because of his refusal to release mental health records T81.  The witness again reviewed Exhibit Z even though according to Z he did not get special education services because of the school recess.  The witness indicated because of JS's frequent transfers they were unable to place him in a program because he was not there long enough.  The student was administered the ABE (which is Adult Basic Education and received cell instruction which is inside the cell T91.)  He received aggressive related therapy; he reviewed "D" the mental health evaluation not part of the DOCS agency T97-T98.

Another witness of the RESPONDENT was Captain M who started as a Corrections Officer for 14 years, Sergeant for 5, a Lieutenant for 7, has been a Captain since 2011, he is mid

management level in charge of security and discipline T103-T104.  He is in charge of the facility

disciplinary process and is a hearing officer.  JS is in the Step Down Program gearing him

towards release from confinement providing him with instruction on job applications, interviews,

increased time with family and phone calls to facilitate transition to life outside of the facility

T105.  The witness reviewed Exhibit 2 a set of disciplinary summaries and stated that there was

an incident on January 14, 2014 T106 after which he was placed in keeplock.  Following the

incident on 02/07/2015 JS was placed in SHU which allows limited personal belongings,

hygiene, magazines, but no electronics and no snacks.    The second incident involved

punishment of SHU.  Keeplock is like house confinement while SHU is like jail.  The objective

is to keep the inmate safe and to keep the other inmates safe as well.  It is a security risk for both

when inmates fight T112.  All of the incidents that the Captain referenced took place in other

facilities.  The witness was not familiar with the details pertaining to same, other than what was

contained in the summary sheets.  He did reference the various code violations.

The RESPONDENT'S witness SM was a teacher at ECF for 9 years having taught pre-

high school equivalent classes and mental health teaching but was not certified as a Special

Education Teacher T130-T131.  He was familiar with JS at the SHU at ECF.  Entering August of

2016 he provided testing to JS while he was in cell study administering the test of Adult Basic

Education (ABE) which has 3 levels; easy, medium and difficult T133.  The witness

administered the easy level.  When JS went through reception he was administered the high

difficulty test.  JS did reasonably well at the easy level and reasonably well at the medium level.

The easy level compares approximately to a 6.9 grade equivalent, the medium to a 9.9 grade equivalent and difficult to a 12.9 grade equivalent T134.  Part of the witness's responsibilities included delivery of educational materials, when the student was in a cell study from August 9, 2016 to September 30, 2016. There was no instruction due to the fact that the program instruction mirrors the academic school year and that would have been summer recess T136.

JS testified as a Psychologist assigned to the WW Hub as a Cognitive Psychologist that has been trained and administered cognitive testing such as the WAIS T167.  She has been a Psychologist for 26 years and with RESPONDENT for 2 T149.  She met JS in December 2014 to determine his educational needs T150.  She testified that JS stated the last school he attended was not the school last attended.   He never attended school at this facility because he was shortly transferred T151 because of mental health reasons.  He received no mental health services, it was determined that he was not eligible for LD services.  JS gave the name of a school that was listed in the book they attempted to get records but there was no response.  She asks all incoming inmates under 21 about their educational needs.  On 9/08/2016 she asked JS for his consents for evaluation but he refused to grant consent to be evaluated signing off on Exhibit 3 T156.  She wanted to test him in other areas. She advised him that he was aging out she was able to administer the Woodcock Johnson IV.  She obtained a medical history, partial social history and a vocational assessment.  The witness reviewed Exhibit Y a Psychological/Academic summary with DOE of 10/03/2016 including a WAIS IV which indicated he had a full scale IQ of a 76 but working memory of a 69, he had issues with fluency in which he did not meet LD

7

classification but there were no mental health records T160.  A short review of the psych

evaluation from 10/03/2016 followed the same patterns T164 as the Woodcock Johnson III from

12/01/2014 and evaluation done by Mr. A.  DOCS had IEPs because it was a residential

placement.  The witness reviewed Exhibit A, an IEP provided by the attorneys for JS dated

8/15/2012 from HL school which referenced drugs or alcohol but he was not on any meds and

did not like his peers or his school T165-T166.  There was a question of whether he knew where

he went to school last.

The Witness reviewed Exhibit R the request for records dated 01/05/2015, however the

witness indicated that the NYC schools are not responsive T174. Exhibit l the psychological

evaluation dated 12/20/2014 that reported JS was "not eligible for services."  The psychologist

did not know JS that well but if he had stayed in the facility she would have furthered the

evaluation T176.  JS was getting cell studies from SM and she administered the TABE Test,

testing adult basic education T177.   He did well on the medium test he did not start the test until

after speaking with his attorney T179.  She followed the normal protocol test procedures and JS

appeared to provide a diligent effort except for one subsection T181.  She reviewed the LD

subtests, Reading Fluency Comprehension, Math, and Writing and Spelling.  She felt he did not

qualify as LD under the DSM T183. There was a teacher report that JS was not cooperative and

was not interested in services.  There were 2 IEPs but she was unable to obtain mental health

records.   The witness reviewed B-1 the un-redacted IEP there was no BIP T187. Exhibit A the

IEP from HL School had JS classified as ED. T189 Exhibit B had JS classified as LD and that

8

J.S. did not need a BIP T190. Most of the JS disciplinary reports did not take place in the school setting but in general population T190. However JS made it clear that he would not go into certain emotional areas as indicated in Exhibits H and I the counseling reports.    After evaluation she spoke with JS about signing the consent for mental health record he refused T193.   There was a CSE meeting where the CSE recommended that J.S. was not eligible for Special education services as a disabled student and was not able to determine if he qualified as emotional disturbance for the failure to disclose mental health records T194.

Another one of DOCS RESPONDENT'S witnesses was DW.  She is a Special Education Teacher at WCF. She is a New York State Certified Special Education and has been with DOCS for the past 18 years T201.  She had given the student cell study specifically designed instruction designed towards reaching the student's IEP goals and she had two IEPs which appeared to be Exhibit A and Exhibit B T202.  She felt the student was on the 4th to 5th grade reading level T197.   She provided a vocational Math TABE's the student was very agreeable and he had done some reading in the program.  She had provided him with services 2x per week. There was a vocational assessment and CSE meeting.  Occasionally the student liked to be a leader.

JS was the next witness and testified regarding his recollection of his educational history having attended high school at EC HL and MH T227. Then he attended MH in 2013, he received small class extra help and counseling.  JS was diagnosed with a disability as a child approximately 7 or 8 years old and had received Special education services since 1st grade because he was easily distracted T228-229, he found it hard to focus and hard to sit still.  He

thought he had a diagnosis of ED and ADHD and he was provided preferential seating, exterior

help and pull out for tutoring 2x per week T229.  He always had small classes with 2 teachers,

always got counseling and a mental health evaluation and used a calculator for math.   The

Exhibit A the "HL" IEP helped him through his work in a 15:1 self contained special class, there

was a pull out for counseling, preferential seating, prompts to stay on task, and use of a

calculator.   MT provided similar services, they felt that without support he could not finish his

work and things would go downhill T236.  While he was at R Island he received normal special

education services T238.  He went into the system at 17.  He went to the UCF for 2 weeks for

reception interviews.  When they him asked about special education services he told them he

received them all of his life, he told them he had an IEP and received mental health services and

evaluations and medicine for depression and anxiety T242.  He indicated his grandmother had

adopted him when he was 2 years old.  The next facility was GCF; he stayed there for 5 months.

There were no CSE meetings; he was given the ABE basic education test which he received no

calculator, no support and no pull out T245.  The witness reviewed Exhibits H and I.  He signed

"H" but he refused to sign "I" because he got mad T246.   There was no meeting with his

grandmother.  The PETITIONER reviewed Exhibit Z and from 03/28/2014 from 05/30/2014 he

received a mental health evaluation at GCF with two teachers and a small class T249.  In March

he went from June 2014 for 3 months received mental health evaluation and counseling 1 teacher

for 3 hours 5x per week he was tested and admits he received cell study T251.

J.S. next went to Mxxxx from June 2014 for 3 months.  He was provided services by 1 teacher OMH through counseling, teaching was 3 hours per day 5x per week and he was tested at MSCF T251.  The next facility was MSB where he received cell study which meant that the teacher would hand homework through the cell bars then the teacher would leave T252.  He worked on reading and writing, there was no pull out for services.  His next stay was at WYCF starting in December, 2014 for a short stay of a couple of weeks T258.  He was in general population with no services, no education and no mental health counseling.  From there he went to ECF for the first go around where he was assigned to the MHU.  The witness was reluctant as to explain why but was coaxed into indicating that it was because he was having suicidal thoughts T259.  From there he went to WACF where he received services in a small class, with 1 teacher in a class of about 10 students 3 hours per day but no special services except for mental health counseling, there was no meeting regarding his educational needs T260.  He stayed there from early 2015-Feb. 2015.  It was the same at WACF no CSE meetings.  He then went to FCF for 11 months, he was in SHU for disciplinary issues T265; he received mental health counseling 1x per week in cell study.  There was no CSE meeting no educational services that he received at home but basic ABE T267.

The witness next reviewed Exhibit M which was a request to obtain educational services dated 1/05/2015 and claimed he never refused services. He also reviewed "Q" which was a form from GM dated 3/15/2016 which contains a question "are you interested in receiving Special Education while incarcerated?" with the "N" circled instead of the "Y." However Exhibit R was

a cover letter dated 3/15/2016 sent to the PETITIONER'S "Special Schools" requesting records.

He was only there for a couple of months.  He was in SHU and cell study with mental health

evaluation pullout for counseling T270.  He would have never said no for services.  He went

back to ECF SHU there is no cell studies, no nothing T273.  He went back to ECF in April of

2016, he was getting cell study work the basics; reading, writing, arithmetic and vocabulary, they

would hand him the stack of papers he was receiving mental health counseling T276.  He met

with the facility counselor JS he was evaluated and he was told he could appeal the testing.  He

refused to sign a release for mental health records because he did not trust her T281.  He asked to

speak with his lawyer and then he would sign he then went to WECF receiving services and cell

studies with a Special Education Teacher T284. He was in a Step Down program transitioning

him back to civilian life.  They explained to him about the programs and opting out.  The witness

acknowledged that he was asked approximately 4 times to sign a release of records and he denied

them each time T287.  There was a rule on calculators in their correctional facilities but admitted

he never received educational services.


## SECTION III : ISSUES

### PETITIONER ISSUES

A.      RESPONDENT is responsible for providing PETITIONER a Free and Appropriate
Public Education pursuant to the IDEA and New York Law.
B.      RESPONDENT failed to promptly secure PETITIONER's IEP, supporting documents
and implement said IEP upon his transfer to RESPONDENT's custody.
C.      RESPONDENT violated its Child Find obligations by failing to evaluate PETITIONER's
need for special education.
D.      The evaluations conducted by RESPONDENT failed to comply with 8 NYCRR §200.4
and did not evaluate all areas of suspected disability or educational needs.
E.       RESPONDENT failed to hold a CSE meeting after evaluating PETITIONER.
F.       RESPONDENT failed to notify PETITIONER or his legal guardian of his
declassification violated the IDEA and related to New York Law.

G.      On numerous occasions, RESPONDENT wrongly changed PETITIONER's educational placement and deprived him of FAPE.

H.      The educational services RESPONDENT provided do not constitute a FAPE.

I.      PETITIONER is entitled to compensatory education based on RESPONDENT gross violation of the IDEA.

J.      PETITIONER is entitled to compensatory education in the form of specialized instruction related services, transition services and comprehensive education.

## RESPONDENT ISSUES

A.      RESPONDENT had no knowledge of JS's eligibility for special education services prior to taking disciplinary action.

B.      RESPONDENT could not implement comparable services from an IEP that it did not have or knew existed.

C.      RESPONDENT complied with prior written notice requirements

D.      RESPONDENT had a bona fide security interest in modifying the PETITIONER'S placement

E.      RESPONDENT provided the PETITIONER with meaningful access to education

F.      RESPONDENT provided FAPE

# SECTION IV : LEGAL ARGUMENTS

The RESPONDENT contends that it is in charge of the care and custody of all inmates convicted under New York State Law.  During the PETITIONER'S incarceration he spent a significant amount of time in the special housing unit or keeplock status due to his continuing pattern of disciplinary violations.  The RESPONDENT provided the PETITIONER with education in line with general education curriculum standards for inmates under 21 without a known history of special education or verified disability classification.

The RESPONDENT referred the PETITIONER for an evaluation and on multiple occasions the PETITIONER refused to consent to review records or disclosed inaccurate information regarding his last school attended prior to his incarceration but the PETITIONER did receive general education services for 621 days of education comprising of 650 educational hours.  The RESPONDENT acknowledges that its facility staff asks inmates during the initial interview upon arrival if the inmate has a history of receiving special education services, they do

13

not have access to Office of Mental Health records, nor are the pre-sentence reports are typically reviewed by the RESPONDENT'S educational staff.  The RESPONDENT explains that it reviews the educational needs and educational levels of all incoming inmates pursuant to Code 40 which reviews grade levels and BETA scores from a psychological group test.  The staff reviews the BETA scores and TABE testing, inquires whether the inmate has a history of special education is done in reception as a pre-referral but does not identify new inmates with a disability or in need of Special education services.  All consents must be signed before the RESPONDENT can implement a Special Education Program.

The RESPONDENT describes cell study as having access to the same curriculum as a general classroom setting given set amounts of hours of service and the option of requesting additional work and if an individual has a verified classification or has received special education services but special education services is available. The RESPONDENT acknowledges that the PETITIONER indicated in his initial reception at ECF during a mental health screening was conducted by OMH that the PETITIONER disclosed he received special education services in the past. However, these are separate agencies and the RESPONDENT does not have access without an authorization and consent.  The acknowledging that the form was cc'd to the education unit, but the RESPONDENT cannot confirm that they actually received it.

The RESPONDENT states that the PETITIONER signed consent to be evaluated on 12/01/2014 and a psychological evaluation was conducted by WA on 12/22/2014 in which the PETITIONER reported previous special education services because of behavioral difficulties however, WA determined that the PETITIONER'S evaluations did not support a diagnosis of a learning disability.  The RESPONDENT claims that they had no prior information of previous special education services received by the PETITIONER.  WA treated the evaluation as an initial

14

evaluation and that the PETITIONER did not meet the criteria for a learning disability.  A CSE

was not convened.  The PETITIONER was transferred to WYCF.  Upon arriving at WYCF in

January of 2015 the PETITIONER informed JS the psychologist, that he had a history in special

education providing her information regarding his last school attended, signed consents to obtain

records and a record request was sent out but the psychologist never received a response to the

record's request.  The PETITONER was subsequently shortly thereafter transferred to WACF for

mental health support.

On 3/15/2016 the RESPONDENT completed an assessment for the New York Special

education services; on 03/18/2016 document Exhibit CC which was the RESPONDENT'S

response to the hearing request.  "Q" indicated that the PETITIONER declined services.

09/08/2016 he refused to consent for further evaluations, 10/03/2016 he  had a history of special

education, but refused to provide those records.  On 09/23/2016 the PETITIONER signed

consent for release of records, on 09/26/2016 the grandmother signed also.   It was reported by

JS the psychologist in her Psychological /Academic summary that the PETITIONER was

unwilling to have mental health assessments to be considered for his evaluation.  The

PETITIONER consistently refused to sign for a release of mental health records which may have

indicated he suffered from an emotional disturbance.  There was an 11/09/2016 CSE meeting

which determined that the PETITIONER did not meet the criteria for a learning disability, they

could not assess his emotional state for an emotional disturbance classification and discussed the

declassification process.  The PETITIONER argues the following:  that all special education

services ended without notice, meetings or due process upon the PETITIONER's admission into

the NYS Correctional system on 12/327/13 and he was deprived of FAPE until his release on

11/23/2016. From 8/12/2012 until his entering into RESPONDENT on 12/13/2013 the

PETITIONER received special education pursuant to an IEP, exhibits A, B, BB, D the PETITIONER testified that without these services he has difficulty focusing and understanding his school work and that the PETITIONER receives special education services at RI similar to that of his IEP.  Upon his admission through reception he informed representatives that he had a disability had been eligible and had received special education services in the past.  He had provided his history of special education services to OMH who provided a copy to the RESPONDENT'S Educational Department, it is presumed they received a copy and there is no evidence to the contrary.  However, the RESPONDENT did not attempt to seek any medical records until January 2015 and no further attempts were made until March of 2016, the RESPONDENT delayed nearly a year before evaluating the PETITIONER to assess his eligibility for special education on the basis of psychologist WA evaluation alone.  The RESPONDENT unilaterally determined that the PETITIONER did not have a learning disability and did was not eligible for special education services without convening a CSE.  Throughout the 3 year incarceration the PETITIONER was placed in ABE for short periods of time only to be removed for disciplinary purposes, he tested at the 3rd grade academic level, and RESPONDENT'S records refer to ABE as special education other.  The testimony was that ABE was not special education and that ABE was not comparable to the services the PETITIONER had received prior to his incarceration.  Other than the 3 months the PETITIONER was in ABE his education consisted of 3 years of cell study where he was confined to solitary confinement known as segregated housing, SHU or cell study.  Even though the PETITIONER's special education needs were identified at reception none of the procedural safeguards required under the IDEA were provided.

In March the PETITIONER testified concerning Exhibit Q the declination of services form dated 03/15/16 he stated " I remember filling it out, but when I first got it, it was blank...That's my signature but that's  not my date." The PETITIONER also stated that he never said he that he did not want to participate in Special education services. Claiming that when he was given the form he was told it was about obtaining educational records T271. Exhibit 3 was the PETITIONER declining service on 9/8/16 however he signed consents after speaking with his attorney. which was blank and then filled in that the PETITIONER was declining services. It was only after the attorneys filed a complaint in this matter that the PETITIONER received special education services in the form of cell study.  The first CSE meeting that the RESPONDENT was not until 11/16/2016, 2 weeks from his release from custody which was held without notice or presence even though the PETITIONER requested counsel attend.

## SECTION V: DECISION/ANALYSIS

### Point A. Correction Law 136

One of the threshold issues is whether the RESPONDENT is responsible for providing the PETITIONER a free appropriate education pursuant to IDEA and New York Law or is a different standard applied pursuant to NYS Correctional Law §136. A review of Correctional Law §136 indicates that

"…Each inmate shall be given a program of education which on the basis of available data seems most likely to further the process of socialization and rehabilitation… the Commissioner of Education shall develop the curriculum and the education programs that are required to meet the special needs of each correctional facility in the department."
As the PETITIONER rightfully argues there is no specific exemption expressly stated in the statute excluding the RESPONDENT from the purview of IDEA, Part 300 of the Federal Regulations New

York State Special Education Law and Part 200 of the Commissioner's Regulations.   The

PETITIONER further argues that 34 CFR §300.324 (d)(ii) indicates the requirements for

children with disabilities in adult prisons that do not apply include the following: general

assessments, transition planning and transition services. An IEP team can modify a child's IEP

based upon bona fide security or compelling  penological interests and that the requirements of

relating to IEPs and LRE do not apply to modifications of the IEP and placements where the

state has demonstrated a bona fide security or compelling  penological interest.  In fact the

PETITIONER argues that the IDEA expressly includes correctional facilities and entities that

must comply with the IDEA referencing §20 USC 1141 and 1142.

CFR 300.324 states

" Children with disabilities in adult prisons—(1) Requirements that do not apply.  The
following requirements do not apply to children with disabilities who are convicted as adults
under State law and incarcerated in adult prisons: (i) The requirements contained in section
612(a)(16) of the Act and §300.320(a)(6) (relating to participation of children with disabilities in
general assessments).  (ii) The requirements in §300.320(b) (relating to transition planning and
transition services) do not apply with respect to the children whose eligibility under Part B of the
Act will end, because of their age, before they will be eligible to be released from prison based
on consideration of their sentence and eligibility for early release. (2) Modifications of IEP or
placement. (i) Subject to paragraph (d)(2)(ii) of this section, the IEP Team of a child with a
disability who is convicted as an adult under State law and incarcerated in an adult prison may
modify the child's IEP or placement if the State has demonstrated a bona fide security or
compelling  penological interest that cannot otherwise be accommodated. (ii) The requirements
of §§300.320 (relating to IEPs), and 300.112 (relating to LRE), do not apply with respect to the
modifications described in paragraph (d)(2)(i) of this section."
      Furthermore §300.154 controls the payment for services and reimbursement further

supporting the applicability of IDEA to the education of Special Ed student in a correctional

facility.  Furthermore the following section clearly creates an obligation based upon the receipt

of funds:

"§ 300.2 Applicability of this part to State and local agencies. (a) States. This part applies to each State that receives payments under Part B of the Act, as defined in § 300.4.  (b) Public agencies within the State. The provisions of this part - (1) Apply to all political subdivisions of the State that are involved in the education of children with disabilities, including:… (iv) State and local juvenile and adult correctional facilities;"

Section 20 USC 1412a does create an exception based upon reliance on State law it reads as

follows:

"(a) In general. A State is eligible for assistance under this subchapter for a fiscal year if the State submits a plan that provides assurances to the Secretary that the State has in effect policies and procedures to ensure that the State meets each of the following conditions: (1) Free appropriate public education (A) In general A free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled from school. (B) Limitation. The obligation to make a free appropriate public education available to all children with disabilities does not apply with respect to children — (i) aged 3 through 5 and 18 through 21 in a State to the extent that its application to those children would be inconsistent with State law or practice, or the order of any court, respecting the provision of public education to children in those age ranges; and (ii) aged 18 through 21 to the extent that State law does not require that special education and related services under this subchapter be provided to children with disabilities who, in the educational placement prior to their incarceration in an adult correctional facility— (I)  were not actually identified as being a child with a disability under section 1401 of this title; or (II)  did not have an individualized education program under this subchapter."

New York State Law does not create an exception to the application of IDEA. NYS

Education Law  § l 4403(4) reads as follows:

"4. To periodically inspect, report on the adequacy of and make recommendations concerning instructional programs or special services for all children with handicapping conditions who reside in or attend  any state operated or state financed social  service  facilities, youth  facilities, health facilities, mental health, mental retardation and  developmental disabilities facilities or state correctional facilities."

Buckley vs State Correctional Institution-Pine Grove, 98 F Supp 3[d] 704 at 713 and recites the

statutory framework.

"However, the IDEA carves out specific exceptions for students convicted as adults under state law and incarcerated in adult institutions. See id. § 1414(d)(7). Specifically, these students are exempt from participation in general assessments and, in some cases, transition

planning and services. See id. § 1414(d)(7)(A). In addition and centrally in issue here, the IDEA permits a student's IEP to be modified in light of certain demonstrated safety or penological considerations. Section 1414(d)(7)(B) states as follows: If a child with a disability is convicted as an adult under State law and incarcerated in an adult prison, the child's IEP Team may modify the child's IEP or placement notwithstanding the requirements of sections 1412(a)(5)(A) of this title [requiring education in the least restrictive environment] and paragraph (1)(A) [relating to the content of IEPs] if the State has demonstrated a bona fide security or compelling penological interest that cannot otherwise be accommodated."

Buckley clearly rejects the argument that the IDEA does not apply to individuals incarcerated in

NYS. As a result I find the IDEA applies to the case herein  and reject the contention of the

RESPONDENT that the Correctional Law 136 exempts them from the  obligations under IDEA

and NYS Education Law 4403(4-6).


Furthermore Buckley relies on <u>HANDBERRY v.  THOMPSON, Jr.  & The Board of

Education of the City of New York; The City of New York</u>, Docket Nos. 03-0047 (L), 03-

0065.United States Court of Appeals, Second Circuit Argued: November 29, 2004. Decided:

01/17/2016 As amended on rehearing: 4/04/2016, New York, NY, for Appellees-Cross-

Appellants. Before: NEWMAN, SACK, and HALL, Circuit Judges. SACK, Circuit Judge.  This

litigation was brought as a class action by inmates in New York City jails challenging the

defendants' asserted failure to provide them with educational services to which they are entitled

under New York State and Federal Law. After several years of litigation, the district court

granted a declaratory judgment to the plaintiffs, concluding that the defendants had failed to

provide such services, and ordered the defendants to create a plan for doing so.  The court later

adopted the defendants' proposed plan and appointed a third party to monitor the plan's execution

for one year.  The <u>Handberry</u> cases included a series of appeals and cross appeals however the

underlying issue is summarized in the introduction of the opinion.

"... plaintiffs brought this class action suit against defendants the City of New York, the Board of
Education of the City of New York ("BOE"), the New York City Department of Correction
("DOC"), and various city officials (collectively the "City defendants") also named as a
defendant was the Commissioner of the New York State Education Department.  The plaintiff
class consists of inmates incarcerated at DOC facilities on Rikers Island who are sixteen to
twenty-one years of age and have yet to receive a high school diploma or its equivalent.
Plaintiffs allege that defendant's have failed to provide them with educational services to which
they are entitled under federal and state law."
The court acknowledged that

"Delivering educational services to disabled students in incarceration, however, presents
unique challenges beyond the ken of a traditional IEP.  For example, many students are in
custody at Rikers Island for only a few weeks at a time, while an IEP typically focuses on ways
of meeting long term goals and objectives in a more stable, longer) term educational setting.  As
a result, an "interim" or "temporary" education plan ("TEP") is often developed and implemented
for students in the Rikers Island schools. While a TEP is functionally similar to an IEP, it is not a
replacement. It is designed as a temporary fix until a more functional and appropriate IEP can be
developed for the student and implemented."

The monitor has identified six issues with regard to IEPs and TEPs, and they are as

follows:

1. Retrieving Prior IEPs.

2. Failure to Develop and Implement TEPs.

3. Goals and Objectives.

4. IEP/TEP Team Participants.

5. Annual Review and Triennial Evaluation.

6. Extended Year Services.

It should be noted that Rikers Island (/ˈraɪkərz/) is New York City's main jail complex and is

operated by the Corrections and is a different entity that the RESPONDENT herein however the

opinion of the 2nd Circuit identifies typical issues and provides useful analysis.  In addition, the

USDOE hasc addressed this point in Dear Colleague letter of 12/05/2014.

The UNITED STATES DEPARTMENT OF EDUCATION OFFICE OF SPECIAL

EDUCATION AND REHABILITATIVE SERVICES in its Dear Colleague: letter of 12/05/2014

as cited by the PETITIONER addressed several key points relative to the proceeding herein.

Those points are as follows:

> "We are writing to focus your attention on the educational needs of students with
> disabilities who  are in correctional facilities. The following are the key points made in
> this letter regarding IDEA, Part B requirements, as they pertain to students with
> disabilities:  Absent a specific exception, all IDEA protections apply to students with
> disabilities in correctional facilities and their parents. *Shared Responsibility to Provide
> FAPE.*  Every agency at any level of government that is involved in the provision of
> special education and related services to students in correctional facilities must ensure the
> provision of FAPE, even if other agencies share that responsibility.• States must have
> interagency agreements or other methods for ensuring interagency coordination in place
> so that it is clear which agency or agencies are responsible for providing or paying for
> services necessary to ensure FAPE for students with disabilities in correctional
> facilities…"

As a result I find that IDEA and NYS Education Law do apply and are not overridden by

Correctional Law 136.

## POINT B: EDUCATIONAL RECORDS

The RESPONDENT, upon the PETITIONER entering the RESPONDENT'S custody In

December of 2013, interviewed and tested the PETITIONER at the reception facility which is

described by the RESPONDENT as a pre-referral but does not classify an inmate or determine

eligibility for special education services.  The RESPONDENT contends that they have no access

to records from OMH and in particular Exhibit D the CNYPC Mental Health Screening-

Structured Interview without consent from the PETITIONER.  The Exhibit D indicates that the

RESPONDENT'S guidance department was carbon copied by OMH.  OP was unable to verify

that they actually received the OMH document.  JS the psychologist interviewed the

PETITIONER who informed the psychologist that in the past, the PETITIONER had received

Special education services.  She met with the PETITIONER in December of 2014 obtained a

consent to obtain records which was mailed out in January 2015. She obtained consent and wrote

to the school based upon information provided by the PETITIONER.  The first documentary

evidence of a request for records is Exhibit N a request to obtain educational records dated

1/5/2015 obtained by JS and sent to the S school located in a large Metropolitan City District .

There was no response to the request and there was no follow up by JS since the PETITIONER

was then transferred to a different facility. The RESPONDENT places blame on the

PETITIONER for the inability of JS the Psychologist to obtain records because the

PETITIONER gave inaccurate information about the name of the school.  There is insufficient

evidence in the record to find that the PETITIONER deliberately, intentionally provided the

name of the school or if it was a mistake or other type of error.   Also there was no a follow up

with the PETITIONER to verify the identity of the school.  The Psychologist stated that she

forwarded the record request to the new facility. It should be noted the PETITIONER was

transferred to numerous facilities due to his misconduct.  It should be noted that the

RESPONDENT is a state agency and not separate correctional several particular facilities. There

was a second request to obtain records by a consent dated 3/15/2016 by NM, Exhibit R which

was addressed to the district indicating that they had no further information.

23

The PETITIONER argues that the RESPONDENT has an obligation under IDEA and New York State Education Law to take reasonable steps to obtain academic educational records. It is telling that the psychologist acknowledged that the PETITIONER attended a school in a district that has a reputation for not providing academic records but there was no follow up letter or phone call.  There were no further attempts to obtain the records until more than a year later. The RESPONDENT'S policy is that they cannot provide special education services unless they can verify that the PETITIONER has an IEP making obtaining the records even more critical. The RESPONDENT was unable to verify the existence of an IEP and the PETITIONER'S prior eligibility for Special education services due in part for their failure to follow up with the PETITIONER'S previous school and I so find.  The acts and omissions of the RESPONDENT are also contrary to the USDOE advice in its Dear Colleague: letter of 12/05/2014 which states:

> "To ensure that students with disabilities in correctional facilities continue to receive FAPE, public agencies must have policies and procedures to ensure that the relevant records of students with disabilities who move to, and from, correctional facilities are transferred as expeditiously as possible," and also must take reasonable steps to appropriately transmit those records to facilitate the student's transition to or from the correctional facility."

The PETITIONER alleges that the RESPONDENT has failed to comply with 200.4(e)(8) which states as follows:

> "(8) Students with disabilities who transfer school districts. (i) Transfer within New York State. In the case of a student with a disability who had an IEP that was in effect in this State and who transfers from one school district and enrolls in a new school district within the same school year, the new school district shall provide such student with a free appropriate public education, including services comparable to those described in the previously held IEP, in consultation with the parents, until such time as the school district

adopts the previously held IEP or develops, adopts and implements a new IEP that is consistent with Federal and State law and regulations."

In the case herein the PETITIONER identified himself as a student with a disability and eligible for Special education services on numerous occasions: during reception to OMH, to AWA the psychologist,  JS the psychologist, to MN the psychologist, and again to the psychologist in the fall of 2016. However the RESPONDENT was unable to obtain the PETITIONER'S educational records  including any IEP's until provided to them by the PETITIONER'S attorney until the filing of the DPHR during the course of the proceeding  herein.

I also find that the RESPONDENT failed to comply with Part 200.4 (e)(8) (iii).  The LEA has an obligation if they are not going to implement the prior district's IEP to conduct an evaluation, hold a CSE meeting and make a recommendation as to eligibility and/or services upon a student transferring into the jurisdiction of the SEA, pursuant to part 200.4 (e)(8)(i) the RESPONDENT has failed to do so and I so find.

However the RESPONDENT claims: first that it was the failure of the PETITIONER to execute consents and they are not responsible; and secondly; WA's psychological evaluation did not indicate that PETITIONER was eligible for Special Educational Services.

The PETITIONER executed consent to obtain educational records as evidenced by Exhibits M request dated 01/05/2015, Exhibit R request dated 3/15/2016, Exhibit W request dated 09/23/2016.  It is not disputed that the RESPONDENT failed to obtain the PETITIONER'S IEP prior to the filing of the Due Process Hearing Request. It was provided to

the RESPONDENT by the PETITIONER'S attorneys.  I find the RESPONDENT failed to put

forth reasonable effort to secure the PETITIONER'S educational records.  I also find that the

RESPONDENT'S policy not to provide special education services unless they can be verified by

an IEP without putting forth a reasonable effort to secure same is a gross violation of FAPE.

Without an IEP in their possession the RESPONDENT was unable to implement a comparable

IEP.  This increases the significance of the evaluation process.

## POINT C. CHILD FIND

The third issue raised by the PETITIONER is that the RESPONDENT failed to comply

with its child find obligations.  The RESPONDENT did not brief this point but agreed to submit

a supplemental  memorandum.  The PETITIONER'S argument in large relies on USDOE Dear

Colleague letter 12/05/2014 which states in relevant part

> *"Child Find and Evaluation*
> • States and their public agencies must have child find policies and procedures in place to identify, locate, and evaluate students who are in correctional facilities who may have a disability under the IDEA and are in need of special education and related services, regardless of the severity of their disability and consistent with the State's child find and eligibility standards.  This responsibility includes students who have never been identified as a student with a disability prior to their entry into the facility.
> Students suspected of having a disability who need special education and related services must be evaluated, subject to applicable parental consent requirements, in a timely manner, even if the student will not be in the facility long enough to complete the evaluation.  If a student transfers from an LEA to a correctional facility in the same school year after the evaluation has begun, and the responsibility for FAPE transfers as well, both agencies must coordinate assessments to ensure that a timely evaluation occurs."

In addition to the Letter to Colleague the PETITIONER relies on 34 CFR 300.111 (a)(i)

and 200.4(b)(6)(xvii).and claim that the evaluations conducted by the RESPONDENT failed to

comply with part 200.4 since they failed to evaluate the PETITIONER in all areas of suspected

disability or educational need. The RESPONDENT contends that any failure should be excused

since the acts or omissions of the PETITIONER by refusing to provide consent or by waiving his

right to services.

The RESPONDENT conducted a psychological evaluation by AAW on 12/22/2014

including academic testing which included Code 4 reviews, Grade Levels, BETA scores from a

psychological group test and TABE testing.  A mental health screening was completed at

reception on 12/27/2013 which indicted a history of special education Exhibit D; there was an

initial interview one on 1/10/2014, Exhibit G showing a reading level of 0.7 and a math level of

1.5. There are various inmate counseling notifications:  Exhibit H not attempting to do

assignments and Exhibit I for sleeping at desk. These were all available prior to the consent to be

tested dated 12/1/2014.  It is undisputed that the RESPONDENT did not conduct a formal mental

health evaluation, nor a formal  medical examination, nor a classroom observation nor a social

history, however there are informal reports, evaluations and interviews concerning the

PETITIONER'S behaviors in the classroom and in general population.   One would expect that

the PETITIONER having been in custody for 3 years would have received proper medical care

and treatment and that there would be records for same however there was no evidence produced

at trial indicating same.  However the main thrust of the dispute was regarding a mental health

evaluation.  The importance of these criteria is that there have been some reports that the

PETITIONER had been previously classified as emotional disturbance and had a history of

behavioral issues all in school and certainly during the course of his incarceration.  There was

well documented behaviors and disciplinary reports regarding his conduct inside the various

facilities and transfers between facilities.  What is concerning is the RESPONDENT had

conducted a pre-testing at reception then the testing performed by WA was more than basic

testing.

Part 200 of the Commissioner's Regulation define special education as follows:

> "(ww) Special education means specially designed individualized or group instruction or
> special services or programs, as defined in subdivision 2 of section 4401 of the Education
> Law, and special transportation, provided at no cost to the parent, to meet the unique
> needs of students with disabilities.
> (1) Such instruction includes but is not limited to that conducted in classrooms, homes,
> hospitals, institutions and in other settings.
> (2) Such instruction includes specially designed instruction in physical education,
> including adapted physical education.
> (3) For the purposes of this definition:
> (i) The individual needs of a student shall be determined by a committee on special
> education in accordance with the provisions of section 200.4 of this Part upon
> consideration of the present levels of performance and expected learning outcomes of the
> student. Such individual-need determinations shall provide the basis for written annual
> goals, direction for the provision of appropriate educational programs and services and
> development of an individualized education program for the student. The areas to be
> considered shall include:
> (a) academic achievement, functional performance and learning characteristics which
> shall mean the levels of knowledge and development in subject and skill areas, including
> activities of daily living, level of intellectual functioning, adaptive behavior, expected
> rate of progress in acquiring skills and information, and learning style;
> (b)  social development which shall mean the degree and quality of the student's
> relationships with peers and adults, feelings about self, and social adjustment to school
> and community environments;
> (c)  physical development which shall mean the degree or quality of the student's motor
> and sensory development, health, vitality, and physical skills or limitations which pertain
> to the learning process; and
> (d) management needs which shall mean the nature of and degree to which environmental
> modifications and human or material resources are required to enable the student to
> benefit from instruction. Management needs shall be determined in accordance with the
> factors identified in each of the three areas described in clauses (a)-(c) of this
> subparagraph.

(ii) Group instruction means instruction of students grouped together according to similarity of individual needs for the purpose of special education. The curriculum and instruction provided to such groups shall be consistent with the individual needs of each student in the group, and the instruction required to meet the individual needs of any one student in the group shall not consistently detract from the instruction provided other students in the group."

The RESPONDENT argues that its Child Find obligations are triggered when it has reason to suspect that the student had a disability and Special education services are necessary to address that disability.  This obligation was not triggered because the PETITIONER did not inform staff during reception T56:8.  However this was disputed by the PETITIONER T241:-11 and the intake documents Exhibit C pg5, D, G. I find that the information was there available to the RESPONDENT, in the possession of the RESPONDENT, and the fact that it did not get to the appropriate department or individuals speak to the policy and procedure of the RESPONDENT and is not the fault of the PETITIONER, and I so find the fact that the RESPONDENT does not typically review PSR's in not a legally sufficient excuse.  Furthermore I specifically reject the RESPONDENT'S argument that it did not have sufficient reason to suspect or have notice to suspect the PETITIONER had a disability in need of special education services and find that it did have sufficient reason to suspect.

## POINT D:  THE EVALUATION PROCESS

The PETITIONER argues the psychologist did an evaluation and failed to consider any classification other than LD, which is contrary to the IDEA and NYS Education Laws.  8 NYCRR 200.1 states a) Student with a disability means a student with a disability as defined in section 4401(1) of the Education Law, who has not attained the age of 21 prior to September 1st

and who is entitled to attend public schools pursuant to section 3202 of the Education Law and

who, because of mental, physical or emotional reasons, has been identified as having a disability

and who requires special services and programs approved by the department.

The terms used in this definition are defined as follows:

"(1) Autism means a developmental disability significantly affecting verbal and nonverbal communication and social interaction, generally evident before age 3 that adversely affects a student's educational performance. Other characteristics often associated with autism are engagement in repetitive activities and stereotyped movements, resistance to environmental change or change in daily routines, and unusual responses to sensory experiences. The term does not apply if a student's educational performance is adversely affected primarily because the student has an emotional disturbance as defined in paragraph (4) of this subdivision. A student who manifests the characteristics of autism after age 3 could be diagnosed as having autism if the criteria in this paragraph are otherwise satisfied.

(2) Deafness means a hearing impairment that is so severe that the student is impaired in processing linguistic information through hearing, with or without amplification that adversely affects a student's educational performance.

(3) Deaf-blindness means concomitant hearing and visual impairments, the combination of which causes such severe communication and other developmental and educational needs that they cannot be accommodated in special education programs solely for students with deafness or students with blindness.

(4) Emotional disturbance means a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a student's educational performance:

(i) an inability to learn that cannot be explained by intellectual, sensory, or health factors.

(ii) an inability to build or maintain satisfactory interpersonal relationships with peers and teachers;

(iii) inappropriate types of behavior or feelings under normal circumstances;

(iv) a generally pervasive mood of unhappiness or depression; or

(v) a tendency to develop physical symptoms or fears associated with personal or school problems.

The term includes Schizophrenia. The term does not apply to students who are socially maladjusted, unless it is determined that they have an emotional disturbance.

(5) Hearing impairment means impairment in hearing, whether permanent or fluctuating, that adversely affects the child's educational performance but that is not included under the definition of deafness in this section.

(6) Learning disability means a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, which manifests itself in an imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations, as determined in accordance with section 200.4(j) of this Part. The term includes such conditions as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia and developmental aphasia. The term does not include learning problems that are primarily the result

of visual, hearing or motor disabilities, of an intellectual disability, of emotional disturbance, or of environmental, cultural or economic disadvantage.

(7) Intellectual disability means significantly sub-average general intellectual functioning, existing concurrently with deficits in adaptive behavior and manifested during the developmental period that adversely affects a student's educational performance.

(8) Multiple disabilities means concomitant impairments (such as intellectual disability-blindness, intellectual disability-orthopedic impairment, etc.), the combination of which cause such severe educational needs that they cannot be accommodated in a special education program solely for one of the impairments. The term does not include deaf-blindness.

(9) Orthopedic impairment means a severe orthopedic impairment that adversely affects a student's educational performance. The term includes impairments caused by congenital anomaly (e.g., clubfoot, absence of some member, etc.), impairments caused by disease (e.g., poliomyelitis, bone tuberculosis, etc.), and impairments from other causes (e.g., cerebral palsy, amputation, and fractures or burns which cause contractures).

(10)  Other health-impairment means having limited strength, vitality or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that is due to chronic or acute health problems, including but not limited to a heart condition, Tuberculosis, Rheumatic Fever, Nephritis, Asthma, Sickle Cell Anemia, Hemophilia, Epilepsy, Lead Poisoning, Leukemia, Diabetes, Attention Deficit Disorder or Attention Deficit Hyperactivity Disorder or Tourette's  Syndrome, which adversely affects a student's educational performance.

(11) Speech or language impairment means a communication disorder, such as stuttering, impaired articulation, language impairment or a voice impairment that adversely affects a student's educational performance.

(12) Traumatic brain injury means an acquired injury to the brain caused by an external physical force or by certain medical conditions such as stroke, encephalitis, aneurysm, anoxia or brain tumors with resulting impairments that adversely affect educational performance. The term includes open or closed head injuries or brain injuries from certain medical conditions resulting in mild, moderate or severe impairments in one or more areas, including cognition, language, memory, attention, reasoning, abstract thinking, judgment, problem solving, sensory, perceptual and motor abilities, psychosocial behavior, physical functions, information processing, and speech. The term does not include injuries that are congenital or caused by birth trauma.

(13) Visual impairment including blindness means impairment in vision that, even with correction, adversely affects a student's educational performance. The term includes both partial sight and blindness."

The PETITIONER is critical of the RESPONDENT for its failure to evaluate in all areas

of suspected disability because WA did not consider all of the 12 classifications. This places an

onerous burden on this RESPONDENT and any LEA. The purpose of requiring CSE's to

consider the required regulatory factors, documents and reports, to review of the records, and to

identify the areas of suspected disability. WA only considered LD classification and determined

the PETITIONER did not qualify.  The RESPONDENT failed to consider whether the

PETITIONE was eligible for special education services under the classification of Emotional

Disturbance based upon the failure of the PETITIONER to cooperate. This claim requires further

review.

The PETITIONER during his testimony displayed a reluctance to discuss  his mental

health  history  apparently due to concerns about prison reprisal however did sign a release in

October of 2016 after discussions with his attorney.

What is unclear is if the RESPONDENT would have been able to receive more valuable

information from his Mental Health records then the RESPONDENT'S observations of the

PETITIONER who was under 24 hour surveillance. There were numerous, behavior and

discipline reports available which were much more current and up-to-date the mental health

records of the PETITIONER who was 17 or younger at the time of the outside mental health

records.  I find that that the RESPONDENT had sufficient information to suspect that the

PETITIONER had mental health issues and behavior issues that should have led to an evaluation

to determine if the PETITIONER should be classified as ED, that any purported refusal to

release mental health records in October of 2016 approximately 34 months into the

PETITIONER'S 36 month stay is of little weight.   The claim by the RESPONDENT that the

PETITIONER had declined services in March of 2016  at the same time as he executed a release

of educational  records for the purposes of obtaining special education services is inconsistent

and must be reconciled since they are inconsistent.

32

Exhibit J is the consent to be tested executed on 12/1/2014.  It states "I consent … to an evaluation …. to determine my educational needs…" It does list a psychological evaluation. WA administered the psychological evaluation and in his report relies heavily on the Woodcock Johnson III the composite and standard scores relate to the low end of the average range and low averages scores.  He also administered the WAIS IV indicated a full scale Intelligence Quotient at 80.  Exhibit M was the request to obtain records dated 1/05/2015.  It should also be noted that RESPONDENT Exhibit 3 was a refusal to be evaluated dated 9/08/2016.  The PETITIONER did consent after speaking with his attorney.  Exhibit Y is Psychological Academic summary report prepared by JS as part of the evaluations performed in October of 2016. She reports that the result of the two testing are consistent however he remained the same in Verbal Comprehension Index but scored lower in the other four subtests.  It also revealed that the PETITIONER's grade equivalent score in December 2014 when he was 17 years old ranged from 9.3 to 7.3. JS the Psychologist relied upon the TABE testing however different levels were administered the first in January 2014 was D or difficult which was age appropriate, in August 2016 was an easy and the September 2016 was a Medium.  Consequently, the PETITIONER scores vary with the easy and medium score being close, however when the material gets more difficult the PETITIONER does extremely poorly.  JS the Psychologist reports that the TABE results appear to be an accurate indication of the PETITIONER's functioning, if that is the case then when confronted with the harder material the PETITIONER is unable to function above a 1.5 grade level. Such a discrepancy between medium and hard would indicate that the student shuts down or becomes

33

frustrated when the material is difficult for him to understand.  This would be consistent with his

actions as reported in the inmate counseling notification Exhibit H dated 4/29/2014 and Exhibit I

dated 4/28/2014 in which it was reported the PETITIONER would put his head down on desk

and fail to participate.  These reports were prior to the evaluation done by WA who in his report

indicated that he relied on the following: review of records, student interview, teacher interview

and WAIS-IV and the WJ III.  It should also be noted that JS was unsure what year she

interviewed the PETITIONER but there is documentary evidence of JS the psychologist

interviewing the PETITIONER on 1/5/15 and I find that is when the initial interview took place.

Furthermore I find the PETITIONER made it clear that he did not want to delve into any sort of

assessment of emotional functioning in October and November of 2016 based on the testimony

of JS T193 whose response refers to the PETITIONER's refusal to disclose mental health

records for the CSE meeting which occurred in November of 2016.   However this was after the

filing of the PETITIONER'S Due Process Hearing Request. This may be a factor in fashioning

remedy but does not excuse the RESPONDENT'S failure before the filing of the complaint.  It

may have a bearing however in fashioning a remedy in this matter.


### Point E. CSE Meetings

The RESPONDENT failed to hold a CSE meeting from the date the PETITIONER

entered the RESPONDENT'S correctional facility until after the PETITIONER had filed a Due

Process Hearing Request.  The PETITIONER was evaluated in December 2014, approximately 1

year after he entered the correctional system.  The PETITIONER claims the RESPONDENT

failed to hold a CSE meeting for this particular PETITIONER, the reason being because WA had

determined that the PETITIONER was not eligible for special education services. The testing

administered in reception was described as pretest.  WA the Psychologist testified and revealed

his opinion that the PETITIONER was not eligible for special education services and was not a

student with a disability.

Procedurally the concept of allowing a single individual to act in place of the Committee

on Special Education is astounding, even RTI decisions are made by a committee. The CSE is

one of the basic tenets of the IDEA in the New York State Education Law nor can the CSE

delegate its responsibility to a single individual nor does the RESPONDENT have the problem

of temporary housing inmates as was the case in Handberry, the RESPONDENT herein failed to

hold a CSE meeting for almost the entire 3 year period of the PETITIONER's incarceration.

The report of WA indicated to some extent the PETITIONER's various needs and

deficits, these were discovered during reception and testimony showed scores significantly below

grade level in reading and in math.  WA testified that the scores were deflated because of the

PETITIONER's incarceration and accompanied depression and poor performance.  The

perception that the RESPONDENT is of the opinion that different standards apply to them is not

supported by the IDEA.  The holding of a CSE Meeting on 11/09/2016 when testimony is

scheduled for 11/17/2016 and 11/18/2016 when the PETITIONER'S out date was approximately

two weeks later does little to cure the acts and omissions of the RESPONDENT.  As a result I

find that the RESPONDENT'S failure to conduct a CSE meeting at the start of the

PETITIONER's incarceration to the filing of the Due Process Hearing Request and then only

shortly before the testimonial hearing is a gross violation of the IDEA. However it should be

noted that the RESPONDENT did comply with the notice requirements leading up to the CSE meeting of 11/09/2016 including prior written notice and I so find.

## **Point F. Declassification and Eligibility Determination**

The PETITIONER argues the RESPONDENT violated the IDEA because he was declassified. The respondent was never in possession of the PETITIONER's IEP, never acknowledged that the PETITIONER had an IEP and was not able to implement said IEP. The RESPONDENT never acknowledged the PETITIONER was classified. As a result I cannot find that the RESPONDENT declassified the PETITIONER. However the RESPONDENT'S representative WA did render an opinion that the PETITIONER was not eligible for special education services. The RESPONDENT placed an imprimatur upon said opinion as if it he was speaking for the CSE   The RESPONDENT did send a Prior Written Notice to the PETITIONER's grandmother/guardian dated 12/01/2014. The RESPONDENT is alleged to have failed to provide the PETITIONER or his guardian with prior written notice of determination of his ineligibility for special education services Exhibit K which states it was CC'ed to Parent or Guardian. At the time of this evaluation the PETITIONER was over the age of 18 years of age and an adult. Also the grandmother/guardian in the presentence report Exhibit C was described as his adopted mother. There is insufficient proof to indicate that at that point in time his grandmother was still legally the PETITIONER's guardian, or rebuttal proof that she did not receive the document. As a result I find that the RESPONDENT did not violate the IDEA by failing to provide written notice to the PETITIONER's grandmother/guardian. The form also has a place for the student's name and DOB but both are blank and there is no proof of mailing which would appear that the RESPONDENT has failed to meets its burden of service upon the PETITIONER however, is a minor violation. The RESPONDENT failed to prove that

it provided procedural safeguards which are also of the IDEA but pales in comparison with some of the prior findings in this matter.

## POINT G. LRE

The PETITIONER also argues that the RESPONDENT violated his LRE rights and that he was not educated in the Least Restrictive Environment.  It is undisputed that the majority of his education was either in cell study or SHU. The exceptions contained in the regulations and Letter to Colleague references a bona fide security or compelling penological interest that cannot otherwise be accommodated.  Captain M testified that generally and particularly regarding the PETITIONER that it is necessary to discipline an inmate who engages in fighting behavior to protect not only other inmates but himself, the underlying theme of the correctional facilities. Notwithstanding the fact the PETITIONER failed to produce evidence, testimony or indication whatsoever sufficient to rebut the testimony of Captain M.

The Dear Colleague letter of December has this to say:

"A student with a disability in a correctional facility who violates a code of student conduct is entitled to the protections in the IDEA discipline procedures that must be afforded to all students with disabilities.  These protections apply regardless of whether a student who violates a code of student conduct is subject to discipline in the facility, removed to restrictive settings such as confinement to the student's cell or lock down units period in any event or removal from the current educational placement results in a denial of educational services for more than 10 consecutive school days, or a  series of removals that constitute a pattern that more than 10 school days in a school year is a change in placement which in turn requires a manifestation determination under IDEA."

However the case herein the PETITIONER was disciplined for behaviors that did not occur in the classroom setting.  Nor is it clear if the PETITIONER violated a student's code or a inmate discipline code. I find that the PETITIONER has failed to rebut the testimony that there was a compelling and penological reason for the discipline of the PETITIONER in the form of cell

study and SHU.  RESPONDENT has provided a compelling and penological reason for its

actions; however LRE consideration applies to identity and classified students.  As outlined

above this was not the case herein and as a result I cannot apply the LRE standards to an

individual who was not classified or identified as student with a disability.

## Point H. FAPE.

The PETITIONER'S argue that the educational services provided by the RESPONDENT

do not constitute FAPE and the RESPONDENT'S educational program is geared to meet the

objectives set forth in Correctional Law §136 to assist the return of the inmate to society as a

wholesome and good citizen.  The PETITIONER argues that the application of §136 does not

apply as it was previously discussed.  The RESPONDENT claims he provided 628 days of

instruction but the PETITIONER argues that there is no evidence that such services were

implemented pursuant to an IEP or provided FAPE when receiving services either in an ABE

classroom or cell study.  The ABE classroom, special education other failed to provide any

additional services or accommodations.  ABE consists of 2-3 hours of instructions per day, there

are 1 to 2 teachers in a classroom of 10 or more students with no individualized instruction or

supports.   This totaled 3 months, the PETITIONER received ABE special educational other and

he received cell study Exhibit Z.  The PETITIONER alleges he received at most 80 hours of time

with a teacher in a classroom, neither ABA nor cell study confirmed any special designed

instruction, transition services or related services to the PETITIONER.

## POINT I.  GROSS VIOLATIONS

The PETITIONER argues that because of the numerous violations of the IDEA and the

New York State Law the PETITIONER should be entitled to compensatory services and alleges

that the RESPONDENT has failed to meet the obligations to the PETITIONER as a transfer

student and implement the most recent IEP, failed to secure records in a timely manner, failed to conduct Child Find Evaluations in a timely manner, failed to evaluate the PETITIONER in all areas of a suspected disability and otherwise conduct an examination in accordance with the IDEA, unilaterally decided to declassify or deem the PETITIONER not eligible for services, failed to provide prior written notice, failed to conduct a manifestation and determination for moving the PETITIONER to a more restrictive environment, failed to provide special education transition or related services throughout the period of incarceration. I have previously found the RESPONDENT is responsible for gross violations of the IDEA.

## POINT J. Remedies

According to the standard established by the Second Circuit of the United States Court of Appeal, compensatory education is instruction provided to a student after he or she is no longer eligible because of age or graduation to receive instruction. It may be awarded if there has been a gross violation of the IDEA resulting in the denial of, or exclusion from, educational services for a substantial period of time (Mrs. C. v. Wheaton, 916 F.2d 69 [2d Cir. 1990]; Burr v. Ambach, 863 F.2d 1071 [2d Cir. 1988]). Compensatory education is an equitable remedy that is tailored to meet the circumstances of the case (Wenger v. Canastota Cent. Sch. Dist., 979 F. Supp. 147, 151 [N.D.N.Y. 1997], aff'd, 208 F.3d 204 [2000], cert. denied 531 U.S. 1019 [2000]; Application of a Child with a Disability, Appeal No. 06-086; Application of the Bd. of Educ., Appeal No. 02-033; Application of a Child with a Disability, Appeal No. 02-019). Compensatory education is a judicially-crafted remedy; it is not an extension of the protections and benefits of the IDEA itself (see Cosgrove v. Bd. of Educ., 175 F. Supp. 2d 375, 388 [N.D.N.Y. 2001] [noting that "the relief arises from equity and is not a legislative authorization to extend the reaches of the statute"]; see also Burr, 863 F.2d at 1078).

The PETITIONER argues that in crafting and awarding compensatory education the courts have ordered that the creation of escrow trust accounts to be funded with the amount determined to remedy the deprivation of education.  The Court in STRECK v. BD OF ED OF THE EAST GREENBUSH CENTRAL SCHOOL DISTRICT, No. 09-3526-cv.United States Court of Appeals, Second Circuit. November 30, 2010 ruled the following where the lower court awarded compensatory education and reimbursement of a reading program for the student who was attending college:

> "In enacting the IDEA, Congress did not intend to create a right without a remedy. Burr v. Ambach, 863 F.2d 1071, 1078 (2d Cir. 1988), vacated on other grounds sub. nom Sobol v. Burr, 491 U.S. 902 (1989), reaff'd, 888 F.2d 258 (2d Cir. 1989). Therefore, when a court grants prospective compensatory education under the IDEA, the prevailing party's ability to utilize that award cannot turn on its ability to finance the costs of the education awarded. Id. To implement the SRO's award, the value of the prospective compensatory education must be set aside by the school district and placed in ESCROW for use in paying *up-front* for the compensatory education expenses."

The only evidence in the record regarding the availability of comparable programs are the 2 IEP's from  the PETITIONER's placement prior to his incarceration and provides some guidance towards crafting a remedy.  It is necessary to determine the amount of services that were provided to the PETITIONER. The RESPONDENT contends the PETITIONER was provided 621 days of educational services.  A review of Exhibit Z reveals the following: that excluding summer and winter recess there were 325 school days that the PETITIONER received instruction.  OP stated there is no instruction on summer recess but he was provided services by the witness SM, teacher at ECF.  It is unclear how that calculation was arrived at.  However the PETITIONER was in custody approximately half of the 2013-2014 school year, all of the 2014-

2015 school year, all of the 2015-2016 school year and half of the 2016-2017 school year, so

approximately 3 full school years of 540 school days.  It should be noted that the PETITIONER

did not receive Extended School Years services in Exhibit A or B. The Prior IEP's, Exhibit Z

reveals approx 645 hours of instruction provided; 95 hours of special education other which is

described by OP as instruction from a certified special education teacher and 550 hours of cell

study meaning he is receiving instruction in a confined area with the inmate inside a cell and the

teacher outside of the cell providing him with educational materials, paperwork and books.  The

teacher interacts with the student by coming to his cell door and stands there, corrects his work,

takes up work,  and the student asks the teacher questions.  They get it 5x a week or for two

hours T92 and based upon the RESPONDENT'S calculations of number of days there was

approximately one hour of total instruction per school day.

    The New York State Department of Corrections and Community Supervision, Academic
Education Program Policies directive number 4804 dated October 9, 2015.  It establishes the
purpose as

> "Since there are clear correlations between level of education and employment and
> between attainments of a high school diploma and reduced recidivism it is the goal of the
> Department of Corrections and Community Services Supervision (DOCCS) that every
> inmate possess a high school diploma or obtain a high school equivalency diploma prior
> to a release."

It is further noted that

>     "Sanctions: An inmate who does not have a verified high school diploma or
> equivalency diploma and refuses to participate in the Academic Education Program
> (either by refusing to accept assignment to the program or by refusing to actively and
> positively participate once assigned) may be denied good behavior allowances in
> accordance with Correctional Law §803."

However Directive 4804 does not specifically outline the instructional hours or

requirements to which the RESPONDENT is obligated to provide to inmates.

    New York State Corrections and Community Supervision Directive number 4805 special

education services dated October 21, 2015 in the Description of Program states

"In 1988, the former Department of Correction Services and New York State Department of Education (SED) signed a memorandum of agreement (MOA) which reflects and continues to conform to the following Laws and Regulations of Education: Public Law 94-142, IDEA (Reauthorized Individuals with Disabilities Education Act amendment of 2004), Part 300 of the Code of Federal Regulations, New York State's " Article 89-Children with Handicapping Conditions) Parts of 1116, 200 and 201 of Title 8 of the Official Compilation of Codes and Rules and Regulations of New York, Education.  This MOA ensures that students with a disability will be provided access to a free public education (FAPE) while incarcerated in an adult correctional facility.  In compliance with Federal and State Laws and Regulations, the Department of Corrections and Community Supervision (DOCCS) provides a continuum of services and all types of programs and security level facilities (See Appendix I)."

It should be noted that definitions of the board of education shall mean an appointed

central office of special education review board that is headed by the director of education i.e.;

witness OP.  It further states the Committee of Special Education (CSE) is a multi disciplinary

community whose composition is defined by Article 89 §4402 of the Education Law.

It should be also noted, in programming

"Students with disabilities must be programmed in a meaningful program for two modules per day.  Program assignments must be a minimum of 5 ½ hours per day with one module of academic instruction.  The other program hours will consist of vocational shop or related services specified by the IEP, as well as other required programs based on individual assessed needs."

It is unclear how Directive 4805 would have impacted the PETITIONER'S educational

services had the RESPONDENT acknowledged and implemented the prior IEP or created a new

IEP.  It is also unclear if the IEP's services were more than the two modules of academic

programming how would that interact with Directive 4805.  However it is clear that an IHO's

authority and jurisdiction is created by statute and regulation and as a result does not have the

jurisdiction to determine the validity of Directive 4805 of it is in conflict with the IEP or IDEA.

It should be also indicated that the Directive 4805 designates special cell study or

outreach services as a special education placement and services are modified based upon security

issues compelling penological requirements of the prison environment.  These services could be

provided directly or indirectly by a certified special education teacher.  It should be noted

however cell study does not by itself reduce the number of instructional hours from requirement of Directive 4805 and the provision of 5 ½ and one module of academic instruction.  Directive 4805 special education placement and services designates special cell study or outreach services as a special education placement and services are modified based upon security issues, compelling penological requirements of the prison environment.  These services could be provided directly or indirectly by a certified special education teacher.  It should be noted however assignments to cell study or SHU does not by itself reduce the number of instructional hours but learning environment and instructional methods can be modified.

It should be also noted that in programming of inmates with program assignments, there must be a minimum of 5 1/2 hours per day with 1 module of academic instruction.  The other program hours will consist of related services specified by the IEP as well as other required programs based upon individual assessed needs.  Directive 4805 does not define module. However the PETITIONER is seeking an hour of special education instruction in math and one hour in ELA.  I find that the duration of the 15:1 sessions in Exhibit A was 45 minutes and should be the module utilized in crafting the remedies herein. The PETITIONER is seeking 2 modules of instruction with a module being 1 hour in duration.

As of the day of the hearing DW the SET gave the PETITIONER cell study for approximately one month at WECF in fall of 2016.  Meeting with him 2x a week, DW stated that it was difficult because the PETITIONER was in programs T203. SM testified that he was a general education teacher at ECF when he was instructed that the PETITIONER was under 21 and had not received educational services, SM was to get him in cell study services since he was in SHU and get him tested.  SM met with him 2x in August of 2016 on or about 8/16/2016 and 8/17/2016 but there was no school until after Labor Day. The PETITIONER was in cell study so

he should have received his materials T141.  Apparently SM did not provide him any instruction

only testing and provided him with cell study materials T142. It should be noted that Exhibit Z

reflects the PETITIONER receiving 35 hours of cell study from 8/19/2016 until 9/30/2016. SM

testified that there was no further school after 8/17/2016 and that the school would start up a few

days after Labor Day. There are 19 school days between Labor Day and 9/30/2016 so it is

difficult to recalculate how RESPONDENT arrived at 35 hours of cell instruction.  However it is

clear other than giving the PETITIONER some material there was no direct instruction until at

least after a few days after Labor Day.  It is also clear that DW the SET only provided instruction

2x per week while the PETITIONER was at WECF. Furthermore it should be noted that

activities such as recreation is provided in hour segments T110. OP described cell study as the

teacher standing outside of the inmate's cell providing instruction, providing material and

answering questions T91.  According to OP the services delivered to the students are tracked by

each facility and "they receive services five times or they receive it two hours."T92.  As a result

of the foregoing it is less than clear how many hours of services were actually received by the

PETITIONER.   Therefore I cannot find that RESPONDENT complied with its own Directive

4805.  In addition I cannot give credit to the RESPONDENT for an  amount of services provided

through cell study.

It would appear that the hours recorded for special education other appears to be more

consistent with the testimony of OP and DW.  As a result I shall find RESPONDENT provided

95 hours of special education other.  However the RESPONDENT failed to establish other than

the services provided by DW in the fall of 2016 that any services were provided by a certified

SET and does contest this point in the hearing.  The PETITIONER seeks compensatory services

equivalent to one hour per day for math and ELA each.  It should be noted that this IHO's

calculations differ from that of the PETITIONER, however applying the same analysis would result in seeking approximately 2 hours per 540 days of instructional days during the PETITIONER's incarceration or 1080 hours of special education services equivalent to the services provided in an ICT program. The RESPONDENT claims they should be entitled to credit for the educational services provided as indicated by Exhibit Z.

The Commissioner's Regulations Part 200.6(g) define integrated co-teaching as:

"(g) A school district may include integrated co-teaching services in its continuum of services. Integrated co-teaching services means the provision of specially designed instruction and academic instruction provided to a group of students with disabilities and nondisabled students. (1) The maximum number of students with disabilities receiving integrated co-teaching services in a class shall be determined in accordance with the students' individual needs as recommended on their IEPs, provided that the number of students with disabilities in such classes shall not exceed 12 students, unless a variance is provided pursuant to subparagraph (i) or (ii) of this paragraph.(2) School personnel assigned to each class shall minimally include a special education teacher and a general education teacher."

An ICT classroom is generally considered less restrictive than a 15:1 self-contained classroom providing exposure to typically developing peers while allowing the SET an opportunity to modify curriculum and tests, reinforce general education instruction provided by the Gen Ed Teacher. The PETITIONER's incarceration would severely limit his ability to interact with typically developing peers. As a result it is less of a concern in evaluating whether the services that the PETITIONER was receiving was comparable to an ICT in a school setting.

It should be noted that Part 100 of the Commissioner of Education Regulations establishes the following general education requirement that would be applicable to the PETITIONER herein.

"100.7 State high school equivalency diploma" Requirements. Each candidate shall have lived within the State of New York for at least one month prior to the examination and; shall be 19 years of age or over; or shall be at least 17 years of age, and: shall not have attended a regular, full-time high school program of instruction within the preceding 12 months; or shall be a member of a high school which has graduated; or shall be a resident of a narcotic addiction control center, or an adjudicated youth under the direction

of a prison, jail, detention center, Office of Children and Family Services facility, parole or probation officer, or other correctional facility, or a patient in a hospital in the State of New York, and the head of such institution certifies that the high school equivalency diploma constitutes an essential element of the rehabilitation program; or shall be enrolled in an alternative high school equivalency preparation program in accordance with subdivision (h) of this section."

Although the record is scant as to the exact details of the program it would be fair to say that the above requirement does not provide anything similar to what would be available to the PETITIONER  under an IEP similar to Exhibit A or B.

The PETITIONER testified that he had always received instruction in a small class with pull out for extra help. The IEP shows ICT with the only related service was counseling.  There is no comparison with the amount of services that the PETITIONER received during his time with the RESPONDENT when compared to that he was receiving per his last known IEP.  This would explain the decrease in his IQ and the low scores in the difficult TABE tests.

The PETITIONER seeks compensatory counseling services and calculates that the PETITIONER is entitled to 72 counseling sessions based upon the last implemented IEP.  The RESPONDENT claims the PETITIONER is not entitled to any compensatory counseling services based on it being an equitable relief.  The RESPONDENT claims the PETITIONER's failure to cooperate with RESPONDENT'S staff in refusing to release mental health records is a bar to such services.  See Exhibit 3 date 9/08/2016 and again in report with a date of evaluation of 10/03/2016 it was reported by JS that the PETITIONER declined to delve into mental health issues.  The PETITIONER was coaxed into providing that information during the hearing.   I find that the PETITIONER's own acts in failing to release mental health records from that point when he told JS in no uncertain terms that he would not discuss those issues as a bar to compensatory services but only during that period of time. This calculates to approximately 12 weeks or 12 sessions.  The PETITIONER is seeking 72 sessions as compensatory education

however, in reviewing the PETITIONER's calculations of 72 days of missed counseling it does

not appear to include the 2015-2016 school year, so there is a missing 40 weeks of counseling

sessions.  The other rationale for denying compensatory education was that the PETITIONER

was moved frequently between different facilities to provide mental health services and because

of disciplinary issues T151.  The RESPONDENT staff made a determination that the

PETITIONER needed mental health services requiring a transfer and provided services.  The

PETITIONER received mental health counseling at GCF. Although there is no indication in the

record as to the amount or nature of counseling provided at this facility.  JS the Psychologist

indicated that the PETITIONER did not receive any educational services in January of 2014

since he was transferred to a different facility which had mental health services T151 and he was

transferred to WCF, a review of Exhibit Z reveals that the PETITIONER was transferred on

01/24/2014 and was there until 05/30/2014 or 18 weeks.  Also there are reports from counseling

incidents.  It should be noted that a common accommodation for students with emotional issues

would be to allow the student to leave the academic setting; this ironically was done for the

PETITIONER by virtue of SHU and cell study. The PETITIONER is critical of the lack of

individualized counseling session, however I find that the staff employed by RESPONDENT is

accustomed to and experienced in dealing with the types of issues exhibited by the

PETITIONER, and RESPONDENT should be given credit for the 18 weeks the PETITIONER

was provided counseling services.  It is difficult to calculate the amount of counseling services

received by the PETITIONER it would appear to be approximately 82 sessions during which it

cannot be documented that he was given counseling services.  It should be noted that it is not

specified as special education services, but none the same there is behavioral modification

components throughout the DOCCS.  It should be noted that 82 sessions would equate to the rate

that services were previously provided would result in a lack of services in excess of 2 school years.   I find as a result the length of SET was denied for the PETITIONER is entitled to compensatory counseling services for 82 sessions at 30 minutes per session which was the form of the delivery of services from Exhibit A.  HL's IEP is 30 minutes and the M's IEP and Exhibit B is silent as to the duration of counseling services.

J.S. the psychologist stated the PETITIONER was transferred to WACF in January 2014 Exhibit Z indicated that he stayed there until 03/21/2014. The RESPONDENT did not provide any schedule for related services provided to the PETITIONER such as counseling.  The PETITIONER stated he received counseling and special education services at MACF; it does not appear on Exhibit Z.  He was at MSB from 10/14 to 12/14 receiving cell study without counseling.  He then went to WYCF in December and received no services there according to Exhibit Z.  It should be noted that there are not any counseling notes or log sheets to track the sessions provided even though OP indicated that each facility keeps its own logs.  As a result I find that the RESPONDENT failed to demonstrate that the counseling sessions provided were based upon an evaluation and of the nature and kind that would justify a finding that the services were comparable.  I find that the PETITIONER is entitled to 82 sessions 30 minutes in duration.

It should also be noted that there are adult services available to provide the PETITONER this type of service through ACCESS -VR.  If these services are available through ACCESS-VR then as a state agency it would not be equitable to require the RESPONDENT to fund said services and I so find.  Furthermore since this remedy deals with an adult if these services are available to him through private providers once he secures insurance coverage, then he should avail himself of these services and make a good faith effort to do so before RESPONDENT should be responsible.

The PETITIONER contends that he is entitled to compensatory services for RESPONDENT'S failure to provide transition services.  The RESPONDENT contends that the PETITIONER was in a Step Down program in preparation of re-entry into the civilian life.  This program included preparation of job applications and other skills. The PETITIONER argues that in his last IEP it referenced his interest in computers and that the RESPONDENT failed to address these interests in a post secondary setting.  The PETITIONER has many obstacles to overcome in his post secondary life in the workforce the most prominent is his felony criminal history; the second would be his fighting.  I find RESPONDENT is uniquely qualified to address these issues.   Furthermore according to the Letter to the College, the SEA is not required to provide transition services; as a result I find that the PETITIONER is not entitled to compensatory transition services.

## SECTION IV: FINDINGS:

**1.**  I find the IDEA applies to the case herein  and reject the contention of the RESPONDENT that the Correctional Law 136 exempts them from the  obligations under IDEA and NYS Education Law 4403(4-6).

**2.**  I find that IDEA and NYS Education Law do apply and are not overridden by Correctional Law 136.

**3.**  I find the RESPONDENT failed to put forth reasonable effort to secure the PETITIONER'S educational records.

**4.**  I also find that the RESPONDENT'S policy not to provide special education services unless they can be verified by an IEP without putting forth a reasonable effort to secure same is a gross violation of FAPE.

**5.** I find that the information was there available to the RESPONDENT, in the possession of the RESPONDENT, and the fact that it did not get to the appropriate department or individuals speak to the policy and procedure of the RESPONDENT and is not the fault of the PETITIONER.

**6.** I so find the fact that the RESPONDENT does not typically review PSR's is not a legally sufficient excuse.

**7.** I find that that the RESPONDENT had sufficient information to suspect that the PETITIONER had mental health issues and behavior issues that should have led to an evaluation to determine if the PETITIONER should be classified as ED, that any purported refusal to release mental health records in October of 2016 approximately 34 months into the PETITIONER'S 36 month stay is of little weight.

**8.** I find the IDEA applies to the case herein  and reject the contention of the RESPONDENT that the Correctional Law 136 exempts them from the obligations under IDEA and NYS Education Law 4403(4-6).

**9.** I find the RESPONDENT failed to put forth reasonable effort to secure the PETITIONER'S educational records al Law 136.

**10**. I find that the RESPONDENT'S policy not to provide special education services unless they can be verified by an IEP without putting forth a reasonable effort to secure same is a gross violation of FAPE.

**11.** I find that the information was there available to the RESPONDENT, in the possession of the RESPONDENT, and the fact that it did not get to the appropriate department or individuals speak to the policy and procedure of the RESPONDENT and is not the fault of the

PETITIONER, and I so find the fact that the RESPONDENT does not typically review PSR's in not a legally sufficient excuse.

**12.** I find that that the RESPONDENT had sufficient information to suspect that the PETITIONER had mental health issues and behavior issues that should have led to an evaluation to determine if the PETITIONER should be classified as ED, that any purported refusal to release mental health records in October of 2016 approximately 34 months into the PETITIONER'S 36 month stay is of little weight.

**13.** JS was unsure what year she interviewed the PETITIONER but there is documentary evidence of JS the psychologist interviewing the PETITIONER on 1/5/15 and I find that is when the initial interview took place.

**14.** I find the PETITIONER made it clear that he did not want to delve into any sort of assessment of emotional functioning in October and November of 2016 based on the testimony of JS T193 whose response refers to the PETITIONER's refusal to disclose mental health records for the CSE meeting which occurred in November of 2016.   However this was after the filing of the PETITIONER'S Due Process Hearing Request. This may be a factor in fashioning remedy but does not excuse the RESPONDENT'S failure before the filing of the complaint.  It may have a bearing however in fashioning a remedy in this matter.

**15.** I find that the RESPONDENT'S failure to conduct a CSE meeting at the start of the PETITIONER's incarceration to the filing of the Due Process Hearing Request and then only shortly before the testimonial hearing is a gross violation of the IDEA. However it should be noted that the RESPONDENT did comply with the notice requirements leading up to the CSE meeting of 11/09/2016 including prior written notice and I so find.

**16.**  I find that the RESPONDENT did not violate the IDEA by failing to provide written notice to the PETITIONER's grandmother/guardian.  The form also has a place for the student's name and DOB but both are blank and there is no proof of mailing which would appear that the RESPONDENT has failed to meets its burden of service upon the PETITIONER however, is a minor violation

**17.**  I find that the PETITIONER has failed to rebut the testimony that there was a compelling and penological reason for the discipline of the PETITIONER in the form of cell study and SHU.  RESPONDENT has provided a compelling and penological reason for its actions; however LRE consideration applies to identity and classified students.

**18.**  I find that the duration of the 15:1 sessions in Exhibit A was 45 minutes and should be the module utilized in crafting the remedies herein.

**19**.  I find that the PETITIONER's own acts in failing to release mental health records from that point when he told JS in no uncertain terms that he would not discuss those issues as a bar to compensatory services but only during that period of time.  This calculates to approximately 12 weeks or 12 sessions.

**20.**  I find that the staff employed by RESPONDENT is accustomed to and experienced in dealing with the types of issues exhibited by the PETITIONER, and RESPONDENT should be given credit for the 18 weeks the PETITIONER was provided counseling services.

**21.**  I find as a result the length of SET was denied for the PETITIONER is entitled to compensatory counseling services for 82 sessions at 30 minutes per session which was the form of the delivery of services from Exhibit A.

**22.**  I find that the RESPONDENT failed to demonstrate that the counseling sessions provided were based upon an evaluation and of the nature and kind that would justify a finding that the services were comparable.

**23.**  I find that the PETITIONER is entitled to 82 sessions 30 minutes in duration.

**24.**  The PETITIONER has many obstacles to overcome in his post secondary life in the workforce the most prominent is his felony criminal history; the second would be his fighting.  I find RESPONDENT is uniquely qualified to address these issues.

**25.**  I find that the PETITIONER is not entitled to compensatory transition services.

## SECTION IV: ORDERED

It is hereby

ORDERED, the RESPONDENT shall be held responsible for the compensatory special education services in Math and ELA.   the equivalent of 45 minute sessions.  The PETITIONER shall be entitled and the RESPONDENT shall be obligated to provide 540 modules of 45 minutes of Specialized math instruction and 540 modules of 45 minutes of Specialized ELA instruction. The RESPONDENT shall be credited with 95 hours of academic special education other services provided during the PETITIONER's incarceration.  The RESPONDENT shall be responsible for providing said services if practicable or in the alternative the funding of an escrow account to pay for the cost of said services. The RESPONDENT shall be entitled to a credit based upon the PETITIONER'S 60% attendance rate; and it is further

ORDERED, the RESPONDENT shall be held responsible for the compensatory counseling services the equivalent of   eighty two (82) sessions of thirty (30) minutes in duration.   It should also be noted that there are adult services available to provide the PETITIONER for this type of service; or example ACCESS -VR. If these services are available through ACCESS VR or other a state agency then it would not be equitable to require the RESPONDENT to fund said services.  In light of compensatory education being an equitable relief the PETITIONER has an obligation and shall be responsible for investigating and making a good faith effort to obtain these services for free or from a low cost provider. If the PETITIONER is unable to the in that event the RESPONDENT shall be responsible for providing said services if practicable or in the alternative the funding of an escrow account to pay for the cost of said services. The RESPONDENT shall be entitled to a credit based upon the PETITIONER'S 60% attendance rate; and it is further

ORDERED, the RESPONDENT shall not be held responsible for the compensatory transition services.


# **PLEASE TAKE NOTICE:**

Any party aggrieved by the findings of fact and the decisions of an impartial hearing officer rendered in accordance with subdivision (I) of section 200.5 may be obtained by either the parent or the board of education by an appeal to a State review officer of the State Education Department. Such a review shall be initiated and conducted in accordance with provisions of parts 279 of this title. Section 279.2 states:

" 279. (2)(b).13  Notice of intention to seek review.
 (a) The parent or person in parental relationship of a student with a disability who intends to seek review by a State Review Officer of the State Education Department of the decision of an impartial hearing officer shall serve upon the school district, in the manner prescribed for the service of a petition pursuant to section 275.8(a) of this Title, a notice of intention to seek review in the following form:

**Notice:**

(a)     The undersigned intends to seek review of the determination of the impartial hearing officer concerning the identification, evaluation, program or placement of (name of student with a disability). Upon receipt of this notice, you are required to have prepared a written transcript of the proceedings before the impartial hearing officer in this matter. A copy of the decision of the impartial hearing officer, a bound copy of the written transcript, including a word index for the written transcript, as well as an electronic transcript, and the original Exhibits accepted into evidence at the hearing and an index to the exhibits must be filed by the Board of Education with the Office of State Review of the New York State Education Department within 10 days after service of this notice.

  (b)     The notice of intention to seek review shall be served upon the school district not less than 10 days before service of a copy of the petition for review upon such school district, and within 25 days from the date of the decision sought to be reviewed. The petition for review shall be served upon the school district within 35 days from the date of the decision sought to be

reviewed. If the decision has been served by mail upon PETITIONER, the date of mailing and the four days subsequent thereto shall be excluded in computing the 25- or 35-day period.

(c)     A notice of intention to seek review shall not be required when the board of education initiates an appeal from an impartial hearing officer's decision. A copy of the board's notice of petition, petition, memorandum of law and any additional documentary evidence shall be served upon the parent within 35 days from the date of the impartial hearing officer's decision. If the decision has been served by mail upon the board, the date of mailing and the four days subsequent thereto shall be excluded in computing the 35-day period."

_____

PAUL T. BUMBALO
IMPARTIAL HEARING OFFICER

March 13, 2017